### EUGENE, Limited, v. CHARLES ARNAO CO., Inc.
### No. 163.

Circuit Court of Appeals, Second Circuit.

Feb. 6, 1933.

Hulbert & Heermance, of New York City (James R. Sheffield, Murray Hulbert, and Edward W. Vaill, all of New York City of counsel), for plaintiff-appellant.

William H. Davis, of New York City, James F. Williamson, of Minneapolis, Minn., and John Hoxie, of New York City, for defendant-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff owns United States patents Nos. 1,720,301 and 1,720,302, issued to Eugene Francois Suter on July 9, 1929. Both relate to the drying of hair on a person's head. No. 1,720,301 had for its primary object the removal of moisture from the hair by the application of heated air directly to and through the hair in a way that would prevent the flow of the air down over the face and do away with the discomfort that entailed. No. 1,720,302 was an improvement which did away with the direct heated air flow to the hair itself and did the drying by passing the hot air over a metal dome just above the hair. Heat so applied to this metal casing warmed the air beneath it which was in contact with the hair. As this air became saturated with moisture from the hair, the vapor was drawn off through holes in the casing by means of a suction device connected by a pipe to the space above the casing. This improvement prevented the carrying of whatever dust and foreign matter might be in the atmosphere directly to the hair.

Both of these devices were designed for use in beauty parlors to dry the hair of patrons after it had been shampooed or otherwise treated so as to become wet. Aside from the difference between drying by direct air contact as in the first patent and indirectly as in the second, the patents were very similar. Variations in the scope of treatment from what will dry over the entire surface of the scalp at one time to only a portion are disclosed, but have no effect upon the issues now before us.

All of the claims in suit are tied to a so-called partial vacuum which is said to be created in the space at the mouth of the outlet pipe which leads to the suction means that draws off the vapor laden air. In practice this suction is furnished by a suitable fan which may be of sufficient capacity to do the work for one or more dryers. The extent of the partial vacuum is dependent upon the amount of suction provided and the extent to which the outer air is excluded from the space into which the mouth of the suction pipe is placed. Suter advocated using a metal dome of a size which would fit rather closely the head of the average person to be treated and blocking the space left between the inside edge at what may be called the base of the dome and the head by means of "a flexible strip of non-porous and preferably waterproof material" which was attached at one of its edges to the lower margin of the dome and would fit snugly around the head. Above and concentric with this dome was a second casing so placed as to leave a space for the circulation of air between the two and to make a curved air chamber with its top opening through a cut-out portion of the second casing to the mouth of the suction pipe. In both patents the air-heating means was placed in a suitable location in the incoming air stream under atmospheric pressure created by

the suction which by removing the air inside the inclosure allowed the outer air to rush in through an inlet. But with the heating means we are not directly concerned.

In No. 1,720,301, as this air was drawn out of the space between the lower and upper casings, which have been called domes, the partial vacuum created in that space caused air to be pulled up from the hair through openings in the lower casing and this in turn brought heated air through tubes extending from the space above the upper casing through the inclosure between the casings to the space between the hair and the lower casing. As the partial vacuum there lowered the pressure below atmospheric, the heated air rushed in through these tubes with whatever force was provided by the difference between the inside and the outside pressure, and, being somewhat confined by the size of the tubes, had a tendency to cause a relatively small volume of air to be "impinged upon or to pass over or through the hair to be dried." Undue condensation of the moisture laden air evacuated into the space between the casings was obviated by permitting a small quantity of hot air to be drawn directly into that space from the hot air supply through holes in the upper casing.

In No. 1,720,302, the mode of operation differed in that there were no tubes or other means for supplying a renewal of heated air directly to the space between the inside of the lower casing over the hair and the hair itself. There were holes in this casing. The space between it and the concentric casing which with it formed the space where the mouth of the suction pipe was located was not shut off from the hot air supply except partially and that only for the purpose of directing the course of the hot air current. As the suction fan created a partial vacuum in the chamber from which it led, the heated air rushed into the space between the two casings. When it passed over the lower casing above the hair, that dome was heated, and that in turn warmed the air beneath it and in contact over the hair. This enabled that air the more readily to absorb the moisture in the hair, and this vapor laden air was drawn out of that space through the holes in the casing by the stream of hot air passing between the two casings and out through the mouth of the suction pipe.

Merely noticing that the prior art discloses various heated air flow hair dryers which narrow the inventive field open to Suter and to call attention in this regard especially to Swiss patent No. 65,631 to Dickele-Thury and French patent No. 534,497 to Dickele and this same patentee, Suter, we shall, for the purpose of this appeal, assume that the claims of these patents which cover the means for producing a partial vacuum are valid.

Claims 3 and 4 of No. 1,720,301 are relied on. They read as follows:

"3. Apparatus for drying hair comprising, a casing adapted to be placed upon the human head, a heating element therein, a closure for the bottom of said casing and having perforations therein through which streams of heated air may pass to impinge upon the hair to be dried and means for producing a partial vacuum to withdraw the moisture-laden air from the space below said closure.

"4. Apparatus for drying hair comprising, a casing adapted to be placed upon the human head, a heating element therein, a closure for the bottom of said casing and having perforations therein through which streams of heated air may pass to impinge upon the hair to be dried, an outlet housing mounted on said closure and means for producing a partial vacuum connected with said outlet housing to withdraw the moisture-laden air from the space below said closure."

Only claim 4 of No. 1,720,302 is here involved. It reads:

"4. Apparatus for drying hair comprising, a casing adapted to be placed upon the human head, heating elements for heating the interior thereof, a heat conductive closure for the bottom of said casing and adapted to receive heat from said heating elements, and means for producing a partial vacuum below said closure and within the hair on the head being treated."

The defendant's hair dryer is constructed with a dome suitable in size and shape to place over the head of the person whose hair is to be dried. This dome has an inner and an outer wall which may be likened to the concentric casings of the patents in suit. They are spaced to permit the flow of air between them. The back of the inner dome is cut out to make a comparatively large opening for the free passage of air out of the dome at that place. In the outlet passage there is a heating element, at a suitable distance away from the head, around which the withdrawn air must pass and be heated. Beyond this heating element is located a fan also inclosed within the outer casing extended. When the fan is operated, it is thus in an air stream it creates by suction from the space between the inner casing and the hair.

It blows this same air into the space between the outer casing extended and the inner one so that air moves from the fan through this space between the two casings back to openings through the inner dome over the head and thence into the space between the inside of the inner casing and the hair and so on to and through the heating element again to be rewarmed. In this way the fan is utilized for a blower as much as for suction, and circulates the air in a continuous stream. This circulation of the air is continued as long as may be desired.

There is nothing between the lower edge of the inside casing and the head over which it is put to prevent access of the outer air to the space between the hair and the dome. Whatever, if any, loss of heated air and influx of outside air takes place at the space between the base of the dome and the head is as may be, for there is no attempt to prevent it. Whatever may be the advantage of what the patentee calls a partial vacuum cannot be present in the defendant's dryer for two obvious reasons: First, as the fan has its exhaust connected with the space between the hair and the inner dome from which it removes the air, it will blow back into that space the air it takes out, and its input must equal in quantity what it takes out. Second, any equalization of pressure necessary, if it can be thought that any is necessary, to prevent a partial vacuum worthy of the name, even if the qualifying word "partial" is extended to the limit of its possibilities, would be constantly supplied through the space open to the outer air around the head at the base of the dome. As the defendant dries by the circulation of hot air and not by using a partial vacuum, there is no infringement of either patent.

Decrees affirmed.